21-1125
*Roe v. St. John's University*

MENASHI, *Circuit Judge*, dissenting:

When St. John's University ("SJU") notified him that a fellow student had accused him of sexual misconduct, Richard Roe ("Roe") sought to defend himself. He offered an account of the events according to which his accuser, a fellow classmate in the Paris study-abroad program named Jane Doe ("Doe"), grabbed his hand and placed it on her body without Roe's consent. SJU said it accepted Roe's version of events—according to which he was not a perpetrator but a victim—but the university suspended him anyway.

While serving that suspension, Roe was accused of sexual misconduct by another SJU student, Mary Smith ("Smith"). The accusation came a single day after SJU became subject to widespread public criticism that it did not protect female students from sexual assault. Among those criticisms was an anonymous tweet accusing Roe of assaulting Jane Doe in Paris. SJU swiftly issued an order prohibiting Roe from contacting Smith. But within hours of that order—and following a newspaper article reporting on the criticism of SJU—the university altered course, suspending Roe pending an investigation into the Smith complaint. After several months and numerous procedural irregularities, SJU expelled Roe. Roe then filed this Title IX action, alleging that SJU discriminated against him on the basis of sex.

The court admits that, accepting the allegations of the complaint, SJU "erroneously concluded that Roe violated SJU's Student Code of Conduct," relied on "a faulty explanation for its erroneous conclusion," and "conducted its disciplinary proceedings in a less-than-flawless manner." *Ante* at 20-22. The court purports to credit Roe's allegation that "SJU provided a baseless explanation" and a "misguided" justification for its decision to discipline Roe. *Id.* at 20.

Yet the court imagines that there may be an "alternative explanation" for SJU's flawed treatment of Roe—one which SJU never articulated—that would not involve sex-based bias. *Id.* at 21. In other words, the court accepts that Roe alleged irregular treatment but concludes that he still cannot state a claim because the court itself can supply a reason for that treatment that does not reflect sex-based bias.

In reaching this conclusion, the court fails to credit the allegations of Roe's complaint and makes factual inferences in favor of SJU—in violation of well-settled principles for reviewing the grant of a motion to dismiss. And the court misconstrues our precedents such that, after today's decision, most Title IX plaintiffs alleging improper discipline will fail to state a claim.

The court seems to be uncomfortable with the requirement of Title IX that schools walk a "razor's edge" when evaluating allegations of sexual misconduct. *Doe v. Univ. of Illinois*, 138 F.3d 653, 679 (7th Cir. 1998) (Posner, C.J., dissenting from the denial of rehearing en banc). "One student's demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 682 (1999) (Kennedy, J., dissenting). Title IX requires schools to balance both interests; when it fails to do so, it is subject to liability for discrimination. "A recipient's treatment of a complainant *or a respondent* in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a) (emphasis added); *see also id.* § 106.45(b)(1) (providing that a grievance process must "[t]reat complainants *and respondents* equitably") (emphasis added). The court discounts those authorities providing that the denial of adequate process to a respondent—that is, "basic principles of fairness and due process"—amounts to discrimination in violation of Title IX. *Vengalattore v.*

2

*Cornell Univ.*, 36 F.4th 87, 115 (2d Cir. 2022) (Cabranes, J., concurring).[1] And it splits from other circuits that have held that an "inexplicable" disciplinary decision raises an inference of sex-based bias. *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020). Instead, the court holds that plausible allegations of an erroneous conclusion, flawed procedures, and baseless reasoning do not even state a claim under the civil rights laws. I dissent.

## I

I begin with the pleading standard that Roe's complaint must meet to survive a motion to dismiss. In *Doe v. Columbia University*, we held that a complaint alleging a Title IX violation must meet the "low standard described in *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)." 831 F.3d 46, 48 (2d Cir. 2016). Under that standard:

> [A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a

---

[1] The court emphasizes that a university disciplinary process does not necessarily include the same procedural protections as a court. *See ante* at 4, 6, 22 n.11, 38. It therefore does not matter, says the court, that "SJU's treatment of [Roe] and the complaints against him may well not have been up to the standards that would apply if the issues that the university officials decided were adjudicated in a federal court proceeding." *Id.* at 38. But the question here is whether SJU's disciplinary actions violated Title IX, not federal court procedural standards. And it is well-established that "procedural irregularities in the investigation and adjudication of the accusations" by a university disciplinary process may indicate discriminatory treatment that violates Title IX. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019). So we must consider the procedural regularity of SJU's disciplinary process and cannot excuse irregularities on the ground that a university is not a court.

> complaint under Title VII, if it pleads specific facts that
> support a minimal plausible inference of such
> discrimination.

*Id*. at 56; *see also Menaker*, 935 F.3d at 30 ("A plaintiff need only allege facts that give plausible support to a minimal inference of discriminatory motivation.") (internal quotation marks omitted).

Before our decision in *Columbia University*, the leading case related to student discipline was *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). In *Yusuf*, we identified the "erroneous outcome" and "selective enforcement" tests. *Id*. at 715. When evaluating a Title IX claim under the "erroneous outcome" test, we ask whether a plaintiff alleged (1) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id*. [2] When evaluating a Title IX claim under the "selective enforcement" test, we ask whether a plaintiff alleged that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715.

It is important to note, however, that "[t]he tests in *Yusuf* … do not capture the full range of conduct that could lead to liability under Title IX." *Doe v. Samford Univ.*, 29 F.4th 675, 687 (11th Cir. 2022).

---

[2] Title IX prohibits educational programs receiving federal assistance from discriminating "on the basis of *sex*." 20 U.S.C. § 1681(a) (emphasis added). *Yusuf* used the term "gender" to mean "sex"; it did not distinguish between these terms. Though such a distinction might be an issue in other cases, *see, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814 (11th Cir. 2022) (concluding that "reading 'sex' to include 'gender identity'" would not "comport with the plain meaning of 'sex' at the time of Title IX's enactment"), the issue is not presented in this case.

Rather, those tests "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision," *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) (Barrett, J.). Our opinion in *Yusuf* does not hold that the "erroneous outcome" and "selective enforcement" tests are the exclusive ways for a Title IX plaintiff to state a claim. The opinion says only that plaintiffs challenging university disciplinary proceedings "can be expected to fall *generally* within [the] two categories" it describes. 35 F.3d at 715 (emphasis added).

We know that the *Yusuf* tests are not exclusive because our subsequent decisions in *Columbia University* and *Menaker* did not even attempt to fit the plaintiffs' allegations into the *Yusuf* categories. Instead, we explained that the key inquiry was whether a plaintiff's allegations support a "minimal plausible inference" that he was "subjected to discrimination on account of sex in the imposition of university discipline." *Columbia Univ.*, 831 F.3d at 56. While the *Yusuf* tests may be helpful for particular types of cases, a plaintiff's failure to fit into the *Yusuf* formula is not a basis for granting a motion to dismiss.

A recent decision in this area confirms that we apply the "minimal plausible inference" standard rather than the *Yusuf* framework. In *Vengalattore v. Cornell University*, the plaintiff claimed that sex-based bias motivated Cornell in its investigation of the plaintiff's alleged sexual misconduct and its decision to discipline him. We held that the complaint's allegations supported an inference of sex-based bias. *See* 36 F.4th at 109. Nowhere in the opinion did we describe the plaintiff's claim as an "erroneous outcome" claim per *Yusuf*. Instead, we asked whether the allegations "support a minimal plausible inference" of sex-based discrimination. *Id.* at 106.

One important reason to apply the *Columbia University* standard rather than the *Yusuf* framework is that *Yusuf* suggested that a plaintiff must show a "particularized … causal connection between the flawed outcome and gender bias." 35 F.3d at 715. Such a requirement would impose a heightened pleading burden on Title IX plaintiffs, which conflicts with the "low standard described in *Littlejohn*" that a plaintiff need only provide allegations to support a "minimal inference" of discriminatory motivation. *Columbia Univ.*, 831 F.3d at 48. *Yusuf*'s confusion on this point may be understandable because *Yusuf* was decided not only before *Littlejohn* but before the Supreme Court decisions on which *Littlejohn* relied.[3] But we have repeatedly admonished district courts to apply the *Littlejohn* standard and not to impose a heightened "particularized" pleading burden on Title IX plaintiffs. *See Columbia Univ.*, 831 F.3d at 55 n.8 ("We have … cautioned district courts against imposing too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage."); *Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015) ("At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face even after they have survived a motion to dismiss."); *see also Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020) ("There is no heightened pleading standard for Title IX claims.").

Today, the court abandons the low pleading standard we described in *Columbia University*. Although it cites our more recent cases, *see ante* at 17, the court declines to apply those standards because "Roe's challenges to SJU's disciplinary proceedings … fit

---

[3] *See Littlejohn*, 795 F.3d at 310 (concluding that "*Iqbal*'s [pleading] requirement applies to Title VII complaints of employment discrimination" in light of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

6

within *Yusuf*'s erroneous outcome and selective enforcement categories" and because Roe's brief "frame[s] his claims around these two theories of sex-based discrimination." *Id.* at 18 n.9. That explanation fails for three reasons. First, it is an overstatement. Roe's brief mentions the erroneous outcome and selective enforcement tests, *see, e.g.*, Appellant's Br. 21, 23, but it also references *Columbia University*'s "minimal plausible inference of … discrimination" framework throughout and without reference to the *Yusuf* tests, *see, e.g.*, *id.* at 31 (arguing that "[t]he plaintiff need only allege facts that support a minimal plausible inference of sexual discrimination on the part of the university" such as "differential treatment between the complainant and respondent in the adjudicatory process"). Roe does not "frame[]" his appeal around the *Yusuf* tests.

Second, even if he had, that would not be a reason to confine our analysis to those tests. In *Columbia University*, the Title IX plaintiff largely *did* frame his brief around the *Yusuf* tests, citing the case over a hundred times. *See generally* Brief for Plaintiff-Appellant-Cross-Appellee, *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016) (No. 15-1536), ECF No. 55. Rather than confine our analysis to *Yusuf*, we announced the proper pleading standard without reference to those tests.[4]

---

[4] The court asserts that confining our analysis to the erroneous outcome and selective enforcement tests is "consistent with our precedents, even those that postdate *Columbia University*," citing one opinion and one summary order. *Ante* at 18 n.9 (citing *Radwan v. Manuel*, 55 F.4th 101, 130-32 (2d Cir. 2022); *Doe v. Colgate Univ.*, 760 F. App'x 22, 30, 33 (2d Cir. 2019)). But in both *Radwan* and *Colgate University*, we emphasized that the plaintiffs expressly pursued one particular theory. *See Radwan*, 55 F.4th at 130 ("In this case, Radwan pursues only a theory of selective enforcement."); *Colgate*

Third, the relevant inquiry focuses on the complaint. Roe's complaint does not even allude to the *Yusuf* tests. [5] Yet it unmistakably pleads sex discrimination. *See, e.g.*, App'x 19 ("St. John's discriminatory bias against Roe as a male student is evident."); *id.* at 24 (alleging that SJU "should not have suspended Roe without the due process required by its own policies and procedures"); *id.* at 34 ("The Conduct Appeals Board['s] bias against Roe as a male student is reflected in their making factual findings beyond their purview and jurisdiction."). Roe has not conceded the proposition that *Yusuf*—and *Yusuf* alone—controls this case.

Even if the court's analysis under the two *Yusuf* tests were correct—and I think it is not—the court ignores our precedents by failing to evaluate, outside those tests, whether Roe's complaint pleaded facts that "support a minimal plausible inference of … discrimination." *Columbia Univ.*, 831 F.3d at 56.

## II

The complaint did plead such facts—even more clearly than a typical Title IX complaint regarding student discipline. When a university adjudicates a claim of sexual misconduct, it often must evaluate two conflicting stories. If the respondent challenges the university's decision under Title IX, he typically alleges that the

---

*Univ.*, 760 F. App'x at 30 ("John Doe's claim proceeds under an 'erroneous outcome' theory of gender bias.").

[5] That is unsurprising because a complaint must plead facts, not legal theories. *See Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997) ("[T]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") (quoting *Albert v. Carovano*, 851 F.2d 561, 571 n.3 (2d Cir. 1988)); *see also Newman v. Silver*, 713 F.2d 14, 15 n.1 (2d Cir. 1983) ("[F]ederal pleading … is by statement of claim, not by legal theories.").

university accepted the complainant's version of events even though the evidence did not support it. This is not such a case. Instead, Roe alleged that SJU accepted *his* version of events. That allegation is plausible because the university, in announcing its disciplinary decision, explained that it relied on Roe's having "admitted" to "engaging in physical contact of a sexual nature with the complainant" and the evidence indicating "a lack of affirmative consent to engage in such contact." App'x 14. But Roe alleged that the only contact to which he admitted involved Doe taking *his* hand without *his* consent. This version of events indicates that Roe engaged in no misconduct, and yet the complaint alleged that SJU nevertheless found him responsible for sexual misconduct and suspended him. These allegations support "a minimal plausible inference" that Roe was "subjected to discrimination on account of sex in the imposition of university discipline." *Columbia Univ.*, 831 F.3d at 56.

## A

When reviewing a motion under Rule 12(b)(6), "the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive." *Id.* at 48.[6] In today's opinion, however, the court affirms the

---

[6] Although the concurring opinion acknowledges that we must assume the truth of Roe's allegations in the complaint, it nevertheless recounts factual allegations from Doe and Smith that do not appear in the complaint. *Ante* at 2-3 (Parker, J., concurring). The concurrence insists that it is necessary to consider these alternative factual accounts to give "context" to the "complicated circumstances under which [SJU] adjudicated … [the] allegations against Roe." *Id.* at 3, 1. But the only "context" relevant to deciding a motion to dismiss is what is contained in the complaint and "any written instrument attached to it as an exhibit or any statements or

district court's Rule 12(b)(6) dismissal on a basis other than the allegations of the complaint. Despite purporting to credit Roe's allegations that SJU's justification of its decision was "faulty" and "baseless," *ante* at 20-21, the court supplies an "alternative explanation" for that decision and decides that, given that alternative explanation, it is impossible to infer that SJU discriminated against Roe on the basis of sex, *id.* at 21. This is a departure from the standard principles for reviewing a dismissal for failure to state a claim.

Roe's second amended complaint makes the following allegations. Roe and Doe were students studying abroad in France. On April 12, 2018, Roe was in Paris at a local club to celebrate a birthday with fellow SJU students studying abroad. Doe asked Roe to dance, and they did. Sometime later, Doe told Roe that she was returning to the SJU dormitory where both were staying. Doe gave Roe her room number and asked him to "check on her" when he arrived at the dorm. App'x 12. Hours later, Roe went to Doe's room and found her awake and on her phone. "Doe invited Roe into her room and, thereafter, Doe took Roe's right hand and placed it upon her fully clothed breast." *Id.* Roe then told Doe, "I am not interested in sex." *Id.* She replied, "Then, get the hell out of here," and Roe left. *Id.*

On September 4, 2018, SJU notified Roe that Doe had filed an incident report with four complaints against him: (1) non-consensual

---

documents incorporated in [the complaint] by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. AT&T Co.,* 62 F.3d 69, 72 (2d Cir. 1995)). Doe's and Smith's alternative factual allegations do not qualify. The concurrence's recitation of factual allegations beyond those that appear in the complaint has no purpose but to introduce disputed facts into our review of a motion to dismiss. By contrast, I rely on the factual allegations of the operative complaint.

sexual contact on April 12, 2018, (2) sexually inappropriate conduct on April 13, 2018, (3) non-consensual sexual contact on April 13, 2018, and (4) non-consensual sexual penetration on April 13, 2018. *See id.* at 303-04. About a month later, Roe attended an SJU Conduct Board hearing to evaluate Doe's complaint. At the hearing, Roe said that Doe "took [Roe's] right hand and placed it upon her fully clothed breasts." *Id.* at 14.

In a letter dated October 15, 2018, the Conduct Board notified Roe that he had been found in violation of SJU rules for non-consensual sexual contact on April 13, 2018, but he was not found to have committed the other three alleged violations. The sole basis for the Conduct Board's conclusion was announced in its letter:

> The respondent [Roe] admitted in engaging in physical contact of a sexual nature with the complainant [Doe], and the evidence demonstrated a lack of affirmative consent to engage in such contact. Such evidence included the complainant's intoxication, as described by multiple witnesses, and the respondent's assertion, which was not disputed, that he was not impaired by alcohol.

*Id.*

The Conduct Board did not specify the "physical contact of a sexual nature" to which Roe "admitted." Roe alleged, however, that "the only 'physical contact of a sexual nature' [to which he] 'admitted' was that 'Doe took his right hand and placed it upon her fully clothed breasts.'" *Id*. Roe concludes, therefore, that the Conduct Board's finding must be based on "Doe taking his hand and placing it upon her breast." *Id.* at 19. This factual allegation is neither conclusory nor speculative. Accordingly, "[u]nder settled principles of adjudication,

11

we must … accept the well-pleaded facts in the complaint as true."
*Washington v. Barr*, 925 F.3d 109, 120 (2d Cir. 2019).

Indeed, this is exactly how the district court evaluated this case.
The district court accepted the truth of Roe's allegations that the
Conduct Board relied on his version of events, and it dismissed his
complaint on that basis:

> [T]he Conduct Board found that Plaintiff "admitted" that
> he and Doe had engaged in sexual contact, and even
> though Plaintiff told SJU's investigator that Doe had
> initiated that contact, the Conduct Board concluded that
> Doe was unable to affirmatively consent to the contact
> due to her intoxication. In other words, even assuming
> that the Conduct Board accepted Plaintiff's account of
> the events, *i.e.*, that Doe had placed Plaintiff's hand on
> Doe's breast, the Board found that Doe did not, and
> could not, have done so knowingly and voluntarily due
> to intoxication, and that Plaintiff, who was "not impaired
> by alcohol," would have known that.

*Roe v. St. John's Univ.*, No. 19-CV-4694, 2021 WL 1224895, at *18
(E.D.N.Y. Mar. 31, 2021). The district court thus concluded that even
though the well-pleaded allegations of the complaint establish that
Doe rather than Roe initiated the contact, SJU appropriately found
Roe rather than Doe responsible for sexual misconduct because Doe
had not consented to her own conduct.

## B

The district court's reasoning is indefensible, as SJU admits on
appeal. SJU acknowledges that if the contact occurred as Roe
admitted, then Doe rather than Roe likely violated SJU's sexual
misconduct policy. *See* Oral Argument Audio Recording at 22:19 ("If

that was the version of events, Roe's conduct would not violate Policy 703 of the university. … In fact, perhaps [Doe] would have been in violation of Policy 703.").

Our inquiry into the rationale behind the Conduct Board's finding would normally end with the well-pleaded allegations of the complaint. *See Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 216 (D. Mass. 2017) ("At this stage of the litigation the court is required to credit Doe's reading of the Hearing Board's decision on this issue, provided … the reading is plausible."). In this case, the complaint plausibly alleged that the Conduct Board accepted Roe's admitted version of events, that those events involved no wrongdoing, and that the Conduct Board disciplined him anyway. Perhaps the Conduct Board's decision could be explained by further evidence, but that must await later stages of the litigation. *See Sabir v. Williams*, 52 F.4th 51, 65 (2d Cir. 2022) (Sack, J.) ("[A]lthough the facts at trial or summary judgment might show otherwise, we cannot manufacture such facts out of thin air.") (internal quotation marks and alteration omitted); *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 206 (2d Cir. 1995) ("[The defendant's] characterization [of a letter] might, if proffered through sworn testimony, raise questions of fact to be resolved at trial. It does not, however, provide a basis for entry of judgment in [the defendant's] favor as a matter of law.").

Even if there were a possible explanation for the Conduct Board's decision aside from sex-based bias, moreover, that explanation would again need to await future stages of the litigation. *See Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009) ("The choice between plausible interpretations … is a question of fact to be resolved by a jury."). For two reasons, Roe's allegations about the Doe incident support "a minimal plausible inference" that Roe was

"subjected to discrimination on account of sex in the imposition of university discipline." *Columbia Univ.*, 831 F.3d at 56.

First, the Conduct Board's reasoning indicates that it treated Doe more favorably than Roe. *See Littlejohn*, 795 F.3d at 312 ("An inference of discrimination can arise from circumstances including … the more favorable treatment of employees not in the protected group."). The Conduct Board decided that Doe could not consent because she was intoxicated, and it held Roe responsible on that basis. But the Conduct Board disregarded the fact that Roe *also* did not consent to the contact. In doing so, the Conduct Board treated Doe's lack of consent more favorably than Roe's. Such differential treatment supports an inference of sex-based bias. *See Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1211 (M.D. Fla. 2019) (holding that allegations plausibly state a claim for sex discrimination when the information "collected during the investigation could have equally supported disciplinary proceedings against Jane Roe for also violating the Sexual Misconduct Policy"); *Doe v. Univ. of Scis.*, 961 F.3d 203, 210 (3d Cir. 2020) (holding that allegations plausibly state a claim of sex discrimination when the university identified the male "as the initiator of sexual activity, notwithstanding the comparable intoxication of both participants").[7]

---

[7] The court sidesteps this argument, suggesting that the disparate treatment at issue in this case is that "SJU suspended Roe and not Doe." *Ante* at 26. But SJU treated Roe and Doe differently when it decided that Doe did not consent because she was intoxicated, disregarded Roe's own lack of consent, and held Roe responsible for the contact. Both Roe and Doe were similarly situated in that they both did not consent to the contact. The court also asserts that this dissent relies only on SJU's justification as creating an inference of sex-based bias, *see id.* at 25, but I have just explained that the complaint also alleged differential treatment.

14

Second, the Conduct Board's otherwise "inexplicable" decision supports an inference of sex-based bias. *Oberlin Coll.*, 963 F.3d at 588. Such an inference is reasonable because "the more outrageous the decision is, the less likely it is that any errors were made in good faith," and "when the erroneous decision ceases to be consistent with good-faith mistake, the explanation of improper bias becomes sufficiently likely to cross 'the line between possibility and plausibility.'" *Samford Univ.*, 29 F.4th at 690 (quoting *Twombly*, 550 U.S. at 557).

## C

The court avoids the conclusion that Roe has stated a claim by making factual inferences in favor of SJU. The Conduct Board's justification for its decision may have been "faulty" and "baseless," the court says, but the faulty decision-making might have been the result of something other than sex-based discrimination. *Ante* at 20-21. Because Roe does not have specific evidence "suggesting that gender bias was a motivating factor behind the erroneous findings," the court decides that its own alternative explanation must prevail and the complaint must be dismissed. *Id.* at 19 (alteration omitted) (quoting *Yusuf*, 35 F.3d at 715).

The court hypothesizes that SJU's faulty decision may have an explanation that would not violate Title IX. Specifically, the court speculates that SJU may have "accepted Roe's concession that he engaged in sexual contact with Doe but did not credit his assertion that Doe initiated the contact." *Id.* at 21. Nothing in the complaint or in SJU's letter explaining its decision supports this theory of the university's decision, so the court posits that SJU must have relied on a justification for its decision that it never articulated, such as "unstated credibility assessments." *Id.* at 22 n.11.

15

The court identifies no allegations in the complaint that support this or any other alternative explanation. Drawing such inferences violates the requirement that, in reviewing the grant of a motion to dismiss, we "draw all reasonable inferences in the *plaintiffs'* favor." *In re Platinum and Palladium Antitrust Lit.*, 61 F.4th 242, 258 (2d Cir. 2023) (emphasis added) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016)). Instead of making inferences in Roe's favor, the court "manufacture[s] … facts out of thin air" to dismiss Roe's complaint. *Sabir*, 52 F.4th at 65 (quoting *Salahuddin v. Goord*, 467 F.3d 263, 275 (2d Cir. 2006)).

In doing so, the court supposes that SJU's otherwise inexplicable decision might have been motivated by something other than a "bias against men." *Ante* at 24 (quoting *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 797 (7th Cir. 2022)). This speculation conflicts with the allegations in the complaint, which suggest that SJU *was* biased against men. For example, the complaint alleged that SJU was criticized by "over 2,000 *women*" for "allowing accused *men* to remain on campus." App'x 24 (emphasis added). By raising the specific issue of sexual misconduct by men, Roe pleads "*minimal* evidence of pressure on the university to act based on invidious stereotypes," which we have said "will permit a plausible inference of sex discrimination." *Menaker*, 935 F.3d at 33.

## D

The court relies on cases from other circuits that suggest that a university may, consistent with Title IX, impose student discipline based on discriminatory procedures that reflect "a pro-complainant, anti-respondent bias." *Samford Univ.*, 29 F.4th at 690. Under this view, "discrimination against respondents is not discrimination on the basis of sex and does not permit a reasonable inference of an anti-male bias

16

because both men and women can be respondents." *Id.* (internal quotation marks and citations omitted). This view is unpersuasive because an anti-respondent bias *is* a sex-based bias. *See Oberlin Coll.*, 963 F.3d at 587 ("[T]he 100 percent responsibility rate—in cases where most if not all the respondents were male—supports an inference regarding bias in the hearings themselves."); *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (deciding that "the statistical evidence … shows a pattern of gender-based decision-making" in part because "nearly ninety percent of students found responsible for sexual misconduct … have male first names").

It is true that "both men and women can be respondents." But both men and women can be complainants too—and yet we would never say that a university may escape liability for deliberate indifference to sexual assault because it may have been motivated by an anti-complainant bias instead of an anti-female bias. To the contrary, we say that deliberate indifference to cases of sexual assault by the university ratifies the perpetrator's targeting of the complainant on the basis of sex, and that satisfies the requirement of demonstrating a sex-based bias. *See Davis*, 526 U.S. at 644-45 ("If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference … cause[s] students to undergo harassment or make them liable or vulnerable to it.") (internal quotation marks and alteration omitted); *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) (explaining that an employer will be liable under Title VII "for sexual harassment on the part of a private individual" when "the employer either ratifies or acquiesces in the harassment by not taking immediate and/or

corrective actions when it knew or should have known of the conduct").[8]

We have held that *accusations* of sexual misconduct work the same way. In *Menaker*, we explained that a complainant's decision to accuse a respondent of "*sexual* misconduct" is "significant, and it suggests that [the respondent's] sex played a part in [the complainant's] allegations," such that a "rational finder of fact" could "infer that such an accusation was based, at least in part, on … sex." 935 F.3d at 38. In turn, the complainant's sex-based "intent may be imputed to [the university]" when the university "controlled … the very complaint process by which [the complainant] sought to effectuate her allegedly discriminatory intent." *Id.* at 38-39. "[I]nsofar as [the university] negligently or recklessly implemented [the complainant's] discriminatory design"—as evidenced by "procedural irregularities" in the complaint process—the university has discriminated on the basis of sex. *Id.* at 39.

Under the alternative approach of some courts, however, a university's treatment of a complainant or respondent will not implicate Title IX if it could have been the product of "anti-complainant" or "anti-respondent" bias. If a university may be excused from biased treatment of a respondent because "both men and women can be" respondents, *Samford Univ.*, 29 F.4th at 690 (quoting *Doe v. Univ. of Denver*, 952 F.3d 1182, 1197 (10th Cir. 2020)), then a university may also be excused from acting with deliberate

---

[8] *See also* Catherine A. MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 Yale L.J. 2038, 2042-43 (2016) ("As the accounts and data below demonstrate, sexual harassment is gender-based because it is directed against a woman because she is a woman or affects women disproportionately.") (internal quotation marks and alteration omitted).

indifference to sexual assault because "both men and women can be" victims of sexual assault as well, *id.* This approach departs from the established case law in this context. *See, e.g., Davis*, 526 U.S. at 643 (holding that "deliberate indifference to known acts of harassment … amounts to an intentional violation of Title IX").

The precedents of our circuit do not allow a complaint alleging improper discipline to be dismissed on the ground that the university may have implemented the complainant's discriminatory design for its own non-sex-based reasons. As in *Menaker*, in this case the complaint plausibly alleged that the complainant made a sex-based accusation against the respondent, and a factfinder "could plausibly conclude that [the university] was negligent or reckless in acting on [the complainant's] allegations" in violation of Title IX. 935 F.3d at 39.

If a university could escape liability under Title IX because it was biased only against "respondents" rather than men, our case law would look very different. In *Columbia University*, we concluded that the plaintiff had pleaded actions "motivated … by pro-female, anti-male bias" because the administrators "declined to seek out potential witnesses [whom the] Plaintiff had identified as sources of information favorable to him" and violated "procedures designed to protect accused students." 831 F.3d at 56-57. Such conduct by the administrators was also consistent with an "anti-respondent" bias. But we did not accept such an explanation, observing instead that "[i]t is not the court's function in ruling on a motion to dismiss for insufficiency of the complaint to decide which was the defendant's true motivation." *Id.* at 56 n.10. Columbia argued that the allegations did "not support an inference of intentional sex discrimination" because "any motivation on the part of the [disciplinary] panel to demonstrate that it takes [sexual assault] complaints seriously is not the same thing as a motivation to discriminate against an accused

male student." *Id.* at 57. In other words, Columbia argued that the
university was biased against the respondent for a reason other than
sex. We rejected that argument because it "fails to recognize the
court's obligation to draw reasonable inferences *in favor* of the
sufficiency of the complaint. *Iqbal* does not require that the inference
of discriminatory intent supported by the pleaded facts be *the most
plausible* explanation of the defendant's conduct. It is sufficient if the
inference of discriminatory intent is plausible." *Id.*

We applied identical principles in *Menaker* and *Vengalattore*. In
neither case did we ask whether the university's behavior could be
explained by an alternative non-sex-based bias such as "anti-
respondent bias." In every case alleging that a respondent was treated
unfairly because of sex, the university's conduct could also be
explained by "anti-respondent bias." If that were a reason for
dismissing the complaint, then *Columbia University*, *Menaker*, and
*Vengalattore* were all wrongly decided.

## E

Today's decision heightens the Title IX pleading standard. In
*Columbia University* we said that the alleged procedural irregularities
did "not *necessarily* relate to bias on account of sex" and that other
factual allegations gave "ample plausible support to a bias with
respect to sex." *Id.* (emphasis added). But we did not establish a rigid
pleading requirement according to which plaintiffs must rebut
alternative possible explanations or establish more than "a minimal
plausible inference" that the plaintiff was "subjected to
discrimination on account of sex in the imposition of university
discipline." *Id.* at 56. We did not hold that every plausible claim must
be alleged the same way. Nor did we foreclose the possibility that we
would join those other circuits that have recognized that the merits of

a university's decision may support an inference of sex-based bias. *See, e.g., Purdue Univ.*, 928 F.3d at 669; *Oberlin Coll.*, 963 F.3d at 588; *Samford Univ.*, 29 F.4th at 690. According to those courts, an erroneous decision that is "inexplicable," *Oberlin Coll.*, 963 F.3d at 588, or "perplexing," *Purdue Univ.*, 928 F.3d at 669, can raise an inference of sex-based bias. Unlike the plaintiff in *Columbia University*, Roe has alleged that the Conduct Board's reasoning, on its face, is inexplicable except by reason of bias. The court's decision today creates a split with those circuits that have held that such a decision raises an inference of sex-based bias.

Moreover, in *Menaker* we expressly declined to "define precisely what sort of irregularities meet the standard of 'clearly irregular investigative or adjudicative process'" and thereby made clear that we have not limited plaintiffs to alleging a particular factual scenario. 935 F.3d at 34. [9] We emphasized that when a school "accept[s] an unsupported accusatory version" of events "over that of the accused," it supports an inference of bias. 935 F.3d at 34 (alteration omitted) (quoting *Columbia Univ.*, 831 F.3d at 57). Roe did not allege that SJU accepted Doe's unsupported version of events over his. He alleged something even more inexplicable absent bias: that SJU accepted *Roe's* version of events—according to which he was not a

---

[9] For this reason, our role in Title IX student discipline cases is not limited to determining whether the evidence substantially favored Roe but the university inexplicably favored Doe. *See Columbia Univ.*, 831 F.3d at 57. Students may be the victims of discrimination even when the evidentiary record is thin. We must determine whether the allegations support a minimal inference of sex-based discrimination by the defendant. Roe's allegations focus on the Conduct Board's reasoning, not the weight of the evidence, and the reasoning supports an inference of bias on the part of SJU.

perpetrator but a victim—and nevertheless found that he had committed a violation.

In the Title VII context, we have never restricted plaintiffs to alleging a specific factual scenario. Rather, "we routinely look to a wide variety of (often subtle) indications that a consideration prohibited by Title VII played a role in the employer's conduct." *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001); *cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("The method suggested in *McDonnell Douglas* for pursuing this inquiry … was never intended to be rigid, mechanized, or ritualistic."). For this reason, a plaintiff may support an inference of discrimination in many ways, including but not limited to "the more favorable treatment of employees not in the protected group[] or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted). A plaintiff may also allege a "'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)). We should not treat Title IX claims differently. "[W]e have long interpreted Title IX by looking to the caselaw interpreting Title VII." *Vengalattore*, 36 F.4th at 103 (internal quotation marks and alterations omitted); *see also Columbia Univ.*, 831 F.3d at 55-56 ("Title VII cases provide the proper framework for analyzing Title IX discrimination claims.").[10]

---

[10] I note that some circumstances might implicate relevant distinctions between Title VII and Title IX. *See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (describing differences in statutory language); *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 63 (2d Cir. 2023) (Menashi, J., concurring) (noting "important differences between" Title VII and Title IX);

Today's decision introduces two errors into our Title IX case law. First, it departs from the straightforward pleading standard of *Columbia University* that a Title IX plaintiff alleging improper discipline must plead "specific facts that support a minimal plausible inference" of discrimination. 831 F.3d at 56. Instead, the court reverts to *Yusuf* in requiring such a plaintiff to plead facts that track the erroneous outcome and selective enforcement tests.

Second, the court's decision imposes a new heightened pleading requirement for Title IX plaintiffs. The plaintiff must preemptively refute alternative explanations of biased treatment by pleading "additional allegations of fact indicating bias on account of sex." *Ante* at 20. In the court's view, alleged treatment that involves an erroneous conclusion, flawed procedures, and a baseless rationale—even in the context of a sexual misconduct adjudication— does not "support a minimal plausible inference of sex discrimination." *Id.* at 39. In other words, a Title IX plaintiff must plead "direct, smoking gun, evidence of discrimination." *Vega*, 801 F.3d at 86 (quoting *Richards v. N.Y.C. Bd. of Educ.*, 668 F. Supp. 259, 265 (S.D.N.Y. 1987)). We long ago rejected such a pleading requirement because discrimination is "elusive," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.8 (1981), and "clever men may easily conceal their motivations," *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir. 1979) (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974)).

Today's decision provides cover for clever university administrators. Going forward, a Title IX defendant may cite today's

---

*Adams*, 57 F.4th at 811 ("Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for … separate living and bathroom facilities."). This case does not involve those circumstances.

decision to argue that as long as its irregular treatment of the plaintiff might be explained on some alternative ground—even one unsupported by allegations in the complaint—the complaint must be dismissed unless the plaintiff has direct evidence that the irregular treatment was based specifically on a protected characteristic. That will prevent plaintiffs from stating otherwise meritorious claims.

## III

The circumstances surrounding Roe's expulsion also allow for a minimal plausible inference of discrimination. This conclusion follows from "the general principle that where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination." *Menaker*, 935 F.3d at 33. Roe plausibly alleged that SJU experienced "at least *some* pressure … to react more forcefully to allegations of male sexual misconduct" and that his expulsion followed a "sufficiently irregular process" that "raise[s] an inference of bias." *Id.* at 34.

## A

Roe alleged that his expulsion followed a "tweet storm" that criticized SJU for its handling of sexual assault complaints. On January 4, 2019, the hashtag "#SurvivingSJU" appeared on Twitter and became the top trending hashtag for the next two days. App'x 15. Over 2,000 tweets "detail[ed] alleged experiences of sexual misconduct that had taken place at St. John's" and "criticiz[ed] St. John's treatment of female complainants of sexual assault." *Id.* at 17. One of those tweets criticized SJU specifically for mishandling the

24

Doe complaint. That tweet read: "[Roe] was allowed to stay abroad after raping me with no travel restrictions. Only got half a semester suspension." *Id.* at 72. The tweet faulted SJU for its failure to impose harsher interim relief and a harsher ultimate sanction on Roe. On January 8, SJU's student newspaper *The Torch* reported on the tweet storm and SJU's public statement in response that it would "investigate all claims." *Id.* at 74.

The tweet storm "provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim." *Purdue Univ.*, 928 F.3d at 669. We have said that, when combined with procedural irregularity, "even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex." *Menaker*, 935 F.3d at 33 n.48.

As in *Menaker*, the university in this case faced sustained "internal criticism for its assertedly inadequate response to male sexual misconduct on campus." *Id.* at 27. The pressure in this case is even more acute than in *Menaker* because Roe was specifically identified as part of the campaign of criticism. The anonymous tweet included Roe's name and picture, accused him of rape, and condemned SJU for failing to punish him adequately. Roe alleged that one day after the tweet, a male student at SJU called Roe and sent text messages threatening to "fuck [Roe] up." App'x 16. He alleged that a female student "punched [him] in his face at a bar." *Id.* at 17. Treating these allegations as true and making all reasonable inferences in Roe's favor—as, again, we must on a motion to dismiss—it is plausible that the tweet accusing Roe of rape was viewed by SJU students who were upset by Roe's alleged behavior and SJU's response. It is difficult to imagine that SJU did not face even "minimal" pressure as a result. *Menaker*, 935 F.3d at 33.

25

The district court discounted the allegations of pressure because Roe did not allege that SJU "continued to experience any such scrutiny when it conducted the Smith hearing over nine months" after the tweet storm. 2021 WL 1224895, at *22. In *Menaker*, however, fourteen months passed between public criticism of the university, *see* 935 F.3d at 27 ("By May 2015, the national press had identified Hofstra as one of several universities under investigation … for possible mishandling of sexual misconduct claims."), and the university's consideration of the relevant Title IX complaint, *see id.* at 28 (noting that the university first "summoned Menaker to a meeting" shortly "after receiving the July 2016 Kaplan Letter"). We did not hold that the public pressure needed to remain constant throughout the university's adjudication of the claim. *See id.* at 33 ("[W]e reject the District Court's attempt to limit *Doe v. Columbia* to cases where the public pressure on a university is particularly acute.").

But even if we did require acute public pressure, Roe's allegations support a plausible inference that "such pressure … affect[ed] how the University treated [him] in sexual misconduct disciplinary proceedings on the basis of sex." *Schwake*, 967 F.3d at 948. SJU issued Roe an interim suspension on January 8, 2019—just four days after the hashtag began trending and the anonymous tweet was publicized. The suspension not only marked the start of the disciplinary process that led to Roe's expulsion but was itself a denial of "the benefits of … any education program or activity" under Title IX. 20 U.S.C. § 1681(a). The temporal proximity between public pressure and the imposition of discipline is much closer in this case than in *Menaker*. Moreover, unlike the criticism in *Columbia University* and *Menaker*, the criticism here addressed SJU's treatment of Roe specifically. That means there is a plausible basis for inferring that the pressure put on SJU in January 2019 affected its decisions to suspend

Roe four days later and ultimately to expel him nine months later. The court does not disagree. *See ante* at 28-29 ("Roe's allegations about the 'tweet storm' … do weigh in favor of Roe's theory of sex discrimination.").

## B

"The only remaining question … is whether [Roe's expulsion] followed a sufficiently irregular process to raise an inference of bias." *Menaker*, 935 F.3d at 34. Here, Roe has pleaded facts that, when taken as true, reflect an irregular investigative and adjudicative process. These irregularities support an inference of bias at every stage of the Smith proceedings. "[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding." *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022). So it is here.[11]

First, less than twenty-four hours after issuing the no-contact order—which would have allowed Roe to return to campus but not to contact Smith—SJU altered course and suspended Roe without a hearing, an investigation, or even a description of the rules he had

---

[11] The court refuses "to consider" some "procedural irregularities" that it believes were not specifically mentioned in the appellate briefing. *Ante* at 32 n.16. But those procedural irregularities are facts alleged in Roe's complaint. *See* App'x 15 (impact statement); *id.* at 28-30 (timeline of Smith complaint until expulsion). The court's insistence that Roe has waived *facts* alleged in his complaint violates the obligation on a motion to dismiss to take the complaint's "factual allegations to be true" and to determine whether those facts "state[] a plausible claim for relief." *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009).

allegedly violated. *See* App'x 17-18.[12] Against the backdrop of the pressure campaign, the decision to suspend Roe before investigating Smith's allegations supports an inference that the university presumed that Roe was responsible. Title IX, like Title VII, requires that "in the course of investigating [sexual misconduct] claims," universities "do not presume male [students] to be 'guilty until proven innocent' based on invidious sex stereotypes." *Sassaman*, 566 F.3d at 314. "[J]ust as the lack of investigation of a reported claim of harassment may factor into the determination of an employer's liability for discrimination against the complainant, so too may it indicate discrimination by an employer whose adverse determination against the putative harasser otherwise bears indicia of prohibited discrimination." *Id.* at 315.

The suspension, moreover, represents a departure from SJU's Students' Bill of Rights, which affords students the right to "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard." App'x 117; *see also Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (holding that an opportunity to be heard requires, among other things, that "if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension"). The failure to provide Roe adequate notice or an opportunity to be heard before issuing the suspension supports an

---

[12] SJU argues that the exhibits attached to Roe's complaint demonstrate that "[i]t is patently false for Roe to claim that he was not provided with notice of the grounds for his suspension in January 2019." Appellee's Br. 32. But Roe was informed only that he was suspended "pending the results of a non-academic disciplinary investigation." App'x 87. SJU did not inform Roe of the allegations against him, the nature of the allegations, or why the suspension was necessary.

inference of bias. *See Doe v. William Marsh Rice Univ.*, 67 F.4th 702, 708 (5th Cir. 2023) (explaining that the university's treatment of the respondent was "deficient" in several ways, including that the respondent was "prohibited from entering campus with only 24-hours' notice" and prior to having a "reasonable opportunity to present his side of the story with the advice of counsel").

The court responds that the interim suspension "was consistent with SJU's internal procedures" because the Student Code of Conduct says that "[a]t any time" and "at the discretion" of university officials, a student may be issued an "interim action[]" such as "an interim suspension." *Ante* at 30-31 (quoting App'x 223). Yet a university cannot insulate itself from allegations that it behaved in a discriminatory fashion simply by writing policies that give it unfettered discretion to impose any sanction at any time. We would never give an employer accused of discrimination such deference in the imposition of discipline. *Cf. Lauture v. IBM Corp.*, 216 F.3d 258, 262 (2d Cir. 2000) ("In the context of a racial discrimination claim brought under federal law, the fact that employment was at will is simply not dispositive.").

Moreover, the court does not acknowledge that SJU also imposes a condition precedent on interim suspensions. SJU's "You Are Not Alone" pamphlet explains that SJU will impose an interim suspension only if the accused student "presents a continuing threat to the health and safety of the community or the complainant." App'x 120. [13] It is irregular, therefore, for SJU to impose an interim

---

[13] The "You Are Not Alone" pamphlet provides students with "important information about prohibited conduct, available resources on and off campus, and ways to file a complaint" related to sexual misconduct. App'x 99. The pamphlet purports to be a student's "first step" in understanding

suspension without making a finding of dangerousness. There is no indication in the complaint or in the record that SJU determined that Roe posed a "continuing threat" to the community prior to imposing an interim suspension.

Second, SJU did not provide Roe with information about Smith's complaint according to the timeframe its policies require. Policy 703—the applicable SJU policy for "any allegation of sexual misconduct," App'x 45—provides that "in most cases complaints will be resolved within 60 days," *id.* at 63.[14] And the Student Conduct

---

how SJU will resolve allegations of sexual misconduct. *Id.* at 100. SJU's Policy 703 states that students "should refer" to the "You Are Not Alone" pamphlet to understand the resources available in that process. *Id.* at 52.

[14] The district court determined that Roe's "reliance on Policy 703 is misplaced because the Policy makes clear that complaints against students are investigated and adjudicated pursuant to procedures outlined in the Student Code." 2021 WL 1224895, at *22. But Roe alleged that in "investigating" Doe's and Smith's complaints, SJU was "required to follow" Policy 703. App'x 13. The court fails to credit that allegation on a motion to dismiss, even though whether and to what extent Policy 703 applied is a disputed factual issue. The district court concluded that Policy 703 did not apply because the "[a]djudication" subsection of Policy 703 states that "[t]he applicable procedure for remedying a complaint depends on whether the accused is a student, member of the faculty, or staff or administrator." *Id.* at 65. But Policy 703 explains that the only procedures applicable specifically to faculty and staff are found in Section VIII, titled "Adjudication of Complaints Against Faculty, Administrators and Staff." *Id.* at 66. The other sections of Policy 703 apply to students as well as faculty. Those sections include the process by which a Title IX coordinator investigates a complaint of sexual misconduct, including the implementation of interim remedies. *Id.* at 61-64. For that reason, when SJU notified Roe of his interim suspension, it "advise[d] [him] to review" the Student Bill of Rights and Policy 703 "*for all the information [he] may need*." *Id.* at 89 (emphasis added). SJU did not reference the Student Code of

30

Process, which forms a part of SJU's Student Code of Conduct, provides that "hearings may be conducted within ninety (90) days of when the incident was documented." App'x 227. It took SJU six months to inform Roe of the allegations and another three months to hold a hearing. *See Oberlin Coll.*, 963 F.3d at 586-87 (concluding that a similar delay amounted to a clear procedural irregularity). SJU's failure to follow its own established timetable was especially serious because Roe was suspended from school pending that proceeding.

Third, Roe was prevented from submitting an impact statement before the sanction was imposed, despite Smith being allowed to do so. The district court dismissed this allegation as insignificant because "the Student Code does not provide for the respondent to submit an impact statement while the appropriate sanction is being decided on." 2021 WL 1224895, at *17. The fact that the university maintained a biased policy before applying it to Roe does not mean that the policy does not plausibly indicate bias. The inquiry in this case is whether the alleged facts lead to a plausible inference of bias. A university's departure from its own policy may indicate such bias, but the policy itself may demonstrate bias as well. Universities cannot avoid liability under Title IX by instituting biased policies. *See Regents of Univ. of Cal.*, 23 F.4th at 940 n.14 ("[E]ven if the University's policies in place at the time condoned these procedures, Doe is entitled to allege that such policies were inherently problematic, as he has done here."); *see also Schwake*, 967 F.3d at 950 ("Contrary to the University's suggestion that there can be no showing of gender bias because University policy foreclosed an appeal, gender bias is a plausible explanation in light of the background indicia of sex discrimination."). If Roe were a faculty

---

Conduct at all. *See Menaker*, 935 F.3d at 34 n.50 (explaining that whether a process is "clearly irregular" depends on, among other things, the "expectations of the parties").

member accused of the same conduct, he would have been able to submit an impact statement, *see* App'x 64, which suggests that the university has specifically designed the student conduct procedures in a discriminatory way to make it easier to penalize students accused of misconduct.[15]

Fourth, the Conduct Board's decision is, on its face, perplexing. *See Oberlin Coll.*, 963 F.3d at 588 ("[A] 'perplexing' basis of decision can support an inference of sex bias.") (quoting *Purdue Univ.*, 928 F.3d at 669). The Student Conduct Process states that the "purpose" of the hearing before the Conduct Board is "to make *findings of fact* with respect to the matter before the panel." App'x 226 (emphasis added). The Conduct Board, however, made no findings of fact apart from its bottom-line conclusions that Roe violated the policy prohibiting non-consensual sexual contact but did not violate the policy prohibiting non-consensual sexual penetration. *See id.* at 142-43. It is irregular for a disciplinary board tasked with making factual findings not to make factual findings about the incident being investigated. Without such findings, the Conduct Board's conclusions are especially perplexing. Smith's version of events was that Roe engaged in non-consensual penetration. *See id.* at 28. Roe denied that he engaged in any sort of

---

[15] *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."); *cf.* 34 C.F.R. § 106.45(b)(1)(vii) (noting that it violates Title IX not to "apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty").

sexual contact at all. The Conduct Board did not agree with either version of events because it concluded that Roe had violated the policy prohibiting non-consensual sexual contact but had *not* violated the policy prohibiting non-consensual sexual penetration. On what basis did the Conduct Board conclude that neither party's account of the encounter was correct? The evidence cited in the Conduct Board's decision does not provide an explanation.[16]

The Conduct Board's perplexing conclusion supports the plausible inference that it decided to find Roe responsible for at least one violation "in order to avoid further negative media attention and to portray a stricter approach to sexual assault cases." *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *see also Regents of Univ. of Cal.*, 23 F.4th at 939 n.12 ("[One] explanation might be that, when confronted by a claim that lacked merit, the University rushed

---

[16] That evidence consisted of "(1) key inconsistencies in [Roe]'s testimony; (2) the accounts of [Roe]'s housemates; and (3) [that] key aspects of [Roe]'s account of the events lacked credibility, including his testimony that he turned [Smith]'s face toward the couch in the event she vomited." App'x 143. We do not know what the housemates alleged because the Conduct Board did not say. The court defends the Conduct Board on the ground that, because "the record does not contain all the evidence the Smith panel considered when it reached its conclusion," there is no "firm basis" to conclude that the Conduct Board's decision was perplexing. *Ante* at 35 n.19. But the lack of a complete record is not a proper ground for granting a motion to dismiss. Instead, we must credit the allegations of the complaint. In his complaint, Roe has plausibly alleged that the Conduct Board acted irregularly because, despite being charged with making factual findings, it issued only legal conclusions. Perhaps a developed record would eventually reveal that the Conduct Board relied on sufficient evidence. But we will never see a developed record because the court has erroneously decided, at the motion-to-dismiss stage, to affirm the dismissal of the complaint because the record has not been developed. This is yet another departure from the standard principles for evaluating a motion to dismiss.

to judgment in issuing the two-year interim suspension and then sought out a way to find the accused responsible for something in order to justify its earlier actions."); *Miami Univ.*, 882 F.3d at 593 (concluding that an "unexplained discrepancy" supported an inference of sex-based bias).

Fifth, Roe alleged that the Appeals Board engaged in erroneous appellate factfinding that contradicted the conclusions of the Conduct Board. The Appeals Board stated that Roe was found to have "digitally penetrated [Smith's] vagina while she was asleep at an off-campus private house." App'x 152. But the Conduct Board never made such a finding. In fact, the Conduct Board found that Roe did *not* engage in non-consensual sexual penetration. *See id.* at 30. Referring to the Doe proceedings, the Appeals Board observed that Roe "twice committed violations of a sexual nature" in which the victim was "unconscious." *Id.* at 157; *see also id.* at 153 (describing the Doe case as involving "an unconscious victim"). But at no point did the Conduct Board—in its evaluation of either the Doe complaint or the Smith complaint—find that the complainant was "unconscious." The Appeals Board relied on these allegedly erroneous findings to affirm Roe's expulsion. The Appeals Board concluded that "the sanction in this case—expulsion—was the only one justified" because "Roe has now a demonstrable history of preying on women while they were in a vulnerable state." *Id.* at 157.[17]

The court acknowledges that the Appeals Board's factfinding is a procedural irregularity. But the court announces that it does "not

---

[17] Doe claimed that Roe engaged in digital penetration while she was asleep, but the complaint plausibly alleged that the Conduct Board did not credit those allegations. Perhaps "the facts at trial or summary judgment might show otherwise," but the plausible allegations at this stage support an inference that the Appeals Board acted irregularly. *Sabir*, 52 F.4th at 65.

consider the Appeals Board's statement regarding the evidence against Roe to be a *major* procedural irregularity" and therefore the irregularity is "not *serious enough* to support a claim of sex-based discrimination." *Ante* at 35-36 (emphases added). The court reasons that the Appeals Board "recognized that the Smith panel determined that Roe violated only the policy against non-consensual sexual contact," so its factual statement to the contrary was a minor irregularity. *Id.* at 35. But that is backwards. The fact that the Appeals Board recognized that the Conduct Board did not find that Roe violated the policy against non-consensual sexual penetration makes it *more* perplexing that the Appeals Board went on to rely on its own improper finding that Roe *did* engage in such conduct.

In sum, the factfinding body (the Conduct Board) failed to find facts but nevertheless concluded that Roe violated school policy and expelled him. Then the appellate body (the Appeals Board) improperly found its own new facts in order to ratify the expulsion. The process reflects "the philosophy of Lewis Carroll's Queen of Hearts: 'Sentence first—verdict afterwards.' This is the opposite of procedural regularity." *Menaker*, 935 F.3d at 36 (footnote omitted) (quoting Lewis Carroll, *Alice's Adventures in Wonderland* (1865)).

Sixth, Roe alleged that SJU "failed to undertake an 'impartial' investigation" of the tweet that accused him of sexual assault after he filed a complaint with the university. App'x 22. That failure, he argues, "stands in stark contrast with St. John's treatment of Smith's complaint." Appellant's Br. 23. The differential treatment of complaints supports an inference of sex-based bias. *See Doe v. Princeton Univ.*, 30 F.4th 335, 344 (3d Cir. 2022) ("Doe has plausibly alleged that he reported a violation that was not investigated by the University. And that, in turn, plausibly supports the inference that sex was a motivating factor in Princeton's investigation."); *Amherst Coll.*,

238 F. Supp. 3d at 218 ("[S]pecific factual allegations that the College responded differently to similar reports when the genders of the potential victims and aggressors were different … provide a foundation from which a court can infer gender-based discrimination may have played a role in the College's responses.").[18] Roe plausibly alleged that "[a]bsent the sexual misconduct proceeding and the alleged pressure that the University faced regarding its handling of sexual misconduct complaints," Roe's complaint would have been taken seriously. *Schwake*, 967 F.3d at 950-51. The failure to address Roe's complaint—coupled with the alleged pressure on SJU—supports a plausible claim of sex discrimination. *See Univ. of Scis.*, 961 F.3d at 211 ("[W]hen Doe's allegations about selective investigation and enforcement are combined with his allegations related to pressure applied by the 2011 Dear Colleague Letter, we conclude that he states a plausible claim of sex discrimination.").

The court insists that "Roe and both Doe and Smith were not … similarly situated" because "Roe accused Doe of anonymously publishing an allegedly harassing, defamatory tweet" whereas "Doe and Smith accused Roe of sexual assault." *Ante* at 37. But Roe did not allege that SJU investigated his complaint less "thoroughly." *Id*. He alleged that SJU "failed to undertake an 'impartial' investigation" at all, even though such an investigation was required by SJU policy and

---

[18] *See also Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 139 (N.D.N.Y. 2018) (holding that allegations that the university *sua sponte* initiated sexual assault proceedings against the male plaintiff, but not against a female student, based on an incident in which both parties were intoxicated, state a plausible selective enforcement claim).

Title IX. App'x 22.[19] SJU stated that "the University cannot sanction the individual who posted the tweet because we cannot confirm their identity." App'x 22. But that is not a reason to forgo an investigation; it is a reason to undertake one. Had SJU taken Roe's complaint of harassment seriously, it could have at least inquired of Doe whether she sent the tweet, as Roe had alleged. Had its investigation yielded no answers, perhaps then SJU could have concluded it was not possible to confirm the sender's identity. The court may be correct that the seriousness of the complaints against Roe justified a greater investigative effort than did Roe's complaint against Doe. But that does not justify SJU's decision to undertake no investigation whatsoever into Roe's complaint. It is at least plausible that the refusal to undertake an investigation indicates bias.

Seventh, Roe plausibly alleged that Director of Student Conduct Jack Flynn tainted the Conduct Board's decision. We have held that an "impermissible bias of a single individual at any stage of the … process may taint the ultimate [adverse] decision even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) (alterations omitted) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008). If a biased employee "influenc[ed] the adverse action by a non-biased

---

[19] Roe notes that SJU's director of Title IX compliance, Keaton Wong, responded to his email, which might be understood as the first step in an investigation. But Wong's email reflected no interest in investigating. Wong simply thanked Roe for his email, disclaimed any chance of identifying the sender of the tweet, and forwarded Roe a copy of the "You Are Not Alone" pamphlet. App'x 22.

decision-maker," then the adverse decision is actionable. *Columbia Univ.*, 831 F.3d at 59. The criticisms that SJU faced during the tweet storm implicated Flynn as the person who decided on interim actions and sanctions. Under these circumstances, "[i]t is plausible that [Flynn] was motivated to refute those criticisms by siding with the accusing female and against the accused male." *Id.* at 58. We have previously held that a complaint states a plausible Title IX claim when it alleges that an administrator who "had suffered personal criticism in the student body for her role in prior cases in which the University was seen as not taking seriously the complaints of female students" had "significant influence, perhaps even determinative influence, over the University's decision." *Id.* Roe alleged that here.

Roe alleged that Flynn "suspend[ed] Roe before investigati[ng]" the Smith complaint "without due explanation." App'x 33. Roe further alleged that Flynn then manipulated the conduct of the hearings to justify his suspension decision: Flynn allegedly "[s]elect[ed] the members of both appeal and hearing panels," *id.*; "[c]oach[ed] the investigator to testify adversely [against] Roe," *id.* at 34; "conferred with the impartial investigator … and members of the [Conduct Board] panel, both in advance of the hearing and thereafter," *id.* at 30; "[a]sk[ed] … to expedite the … appeal decision due to pressure of over 2,000 tweets by female students against St. John's," *id.* at 33; and "[c]onspir[ed]" with a member of the Appeals Board to disallow Roe from submitting a written impact statement, *id.* at 34. The fact that Flynn was "responsible to ensure that all student conduct proceedings are carried out in accordance with the Student Conduct Process," *id.* at 155, is enough to support a reasonable inference that Flynn had "supervisory authority [and] institutional influence in recommending and thus influencing" the Conduct Board's decision. *Columbia Univ.*,

831 F.3d at 59. Flynn was also responsible for deciding the appropriate sanction. *See* App'x 230 ("The sanctions … are imposed by the Office of Student Conduct."). And it is plausible that the bias that affected the interim suspension would also have motivated the eventual expulsion. *See Amherst Coll.*, 238 F. Supp. 3d at 223 (holding that a claim of sex discrimination was plausible based on the allegation that "the College intended [the plaintiff's] punishment to appease campus activists who sought the expulsion of a male student").

## C

Like the irregularities alleged in *Columbia University* and *Menaker*, SJU allegedly failed to follow its own procedures, failed to investigate Roe's complaint, and reached decisions that were perplexing and based on incorrect or unproved versions of the facts. Other circuits have held that similar allegations are enough to state a claim under Title IX. *See, e.g., Schwake*, 967 F.3d at 951 (holding a claim to be plausible based on allegations that the university failed to consider the accused's version of the alleged assault); *Purdue Univ.*, 928 F.3d at 669 (holding a claim to be plausible based on allegations that the university's Title IX investigator credited the story of the female accuser over the male accused when the investigator had never spoken with the accuser); *Baum*, 903 F.3d at 586 (holding a claim to be plausible based on allegations that the appeals board exclusively credited female testimony and rejected male testimony).

Like the allegations in those cases, Roe's allegations provide "circumstantial evidence of bias in [his] specific proceeding" that, when combined with the allegations of sex-based pressure, "gives rise to a plausible claim." *Baum*, 903 F.3d at 586. "There is nothing implausible or unreasonable about the Complaint's suggested

39

inference that the panel adopted a biased stance in favor of the accusing female and against the defending male … in order to avoid further fanning the criticisms that [SJU] turned a blind eye to such assaults." *Columbia Univ.*, 831 F.3d at 58.

### IV

Independent of his claims for improper discipline, Roe alleges that SJU was deliberately indifferent to a hostile educational environment because it failed to respond to the anonymous tweet accusing him of rape. I agree that the district court was correct to dismiss this claim because the alleged harassment was not "so severe, pervasive, and objectively offensive that it can be said to deprive [him] of access to the educational opportunities or benefits provided by the school." *Ante* at 40 (quoting *Davis*, 526 U.S. at 650).

I note that the district court nevertheless erred when it dismissed Roe's claim on the ground that the tweet "was based on [Roe's] alleged past conduct, not his gender." 2021 WL 1224895, at *20. In *Menaker*, we held that a student's false accusation of sexual misconduct was plausibly "motivated, at least in part, by Menaker's sex." 935 F.3d at 38. The student, we explained,

> did not accuse Menaker of just any misconduct; she accused him of sexual misconduct. That choice is significant, and it suggests that Menaker's sex played a part in her allegations. A rational finder of fact could therefore infer that such an accusation was based, at least in part, on Menaker's sex.

*Id.*; *see also Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 149 (2d Cir. 2014) (observing that "false statements … intended … to establish a claim of racial harassment … could be viewed by a reasonable observer as themselves racial harassment"). So too here. Assuming,

40

as we must on a motion to dismiss, that the tweet falsely accused Roe of rape, then the tweet would represent sex-based harassment.

Still, for the other reason the court provides, I would affirm the district court's dismissal of Roe's claim alleging deliberate indifference.

\*　　　\*　　　\*

Universities subject to Title IX must ensure that students are not denied educational opportunities because of sex-based discrimination. In the context of discipline arising from alleged sexual misconduct, schools must investigate allegations of misconduct, lest the victims be deprived of educational opportunities, and must afford procedural protections to the accused, lest those students be similarly deprived. *See* 34 C.F.R. § 106.45(a). Universities are not free to "favor the accusing female over the accused male, so as to protect … the University from accusations that [the University] had failed to protect female students from sexual assault." *Columbia Univ.*, 831 F.3d at 57. A university may not "expel first and ask questions later." *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 969 (6th Cir. 2020).

Yet today the court tells SJU that it need not provide defensible reasons for suspending men accused of sexual assault. It authorizes a university to provide an accused student with flawed procedures and then to rely on "a faulty explanation for its erroneous conclusion" that he should be expelled. *Ante* at 21. And it tells SJU that a litany of procedural irregularities will be excused absent specific evidence that refutes whatever alternative explanation for the irregularities a court might imagine. That approach is inconsistent with our precedents and with Title IX.

None of these considerations necessarily mean that Roe should ultimately prevail in this case. *See Purdue Univ.*, 928 F.3d at 670 ("To

be sure, John may face problems of proof, and the factfinder might not buy the inferences that he's selling."). Perhaps SJU followed a more regular process and had a more reasoned justification for its decisions than the complaint describes. But "[w]e are limited here to the allegations in the complaint and the evidence in the attachments to it. … [A]lthough the facts at trial or summary judgment might show otherwise, we cannot manufacture such facts out of thin air" but should require SJU to establish those facts. *Sabir*, 52 F.4th at 64-65 (internal quotation marks and alteration omitted). Because Roe's "allegations raise a plausible inference that he was denied an educational benefit on the basis of his sex … his claim should have made it past the pleading stage," and we ought to reverse the district court's "premature dismissal of it." *Purdue Univ.*, 928 F.3d at 670. Accordingly, I dissent.